# The Scranton Gas and Water Company, Appellant, *v.* The Northern Coal and Iron Company.

*Eminent domain—Taking of property already in public use—Railroads —Gas companies.*

A franchise is property, and, as such, may be taken by a corporation having the right of eminent domain; but, in favor of such right, there can be no implication unless it arises from a necessity so absolute that without it the grant itself will be defeated. It must also be a necessity that arises from the very nature of things, over which the corporation has no control. It may not be a necessity created by the company itself for its own convenience or for the sake of economy.

A railroad company will not be permitted to condemn, for an additional track, a portion of the land of a gas company necessary for the latter's present and future uses, where the taking of such land is merely for the convenience of the railroad company and for the sake of economy.

Argued Feb. 22, 1898. Appeal, No. 150, Jan. T., 1898, by plaintiff, from decree of C. P. No. 1, Lackawanna Co., June T., 1891, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and FELL, JJ. Reversed.

Bill in equity for an injunction.

The facts appear by the opinion of the Supreme Court and by the opinion of GUNSTER, J., which was as follows:

The very full and carefully prepared report of the learned master makes it unnecessary for us to go into a detailed discussion of all the evidence from which he has found the facts. Indeed, under the evidence, there is little, if any, room for dispute over the material facts of the case, and only two exceptions have been taken to the master's report in that respect. The plaintiff, the Scranton Gas and Water Company, was incorporated by the Act of March 16, 1854, P. L. 1856, p. 599. By various supplements, cited in the master's report, the powers conferred in the original charter were from time to time enlarged and increased, and the corporation invested with the power of eminent domain, and there is no doubt that, by virtue of these different acts of assembly, it became and is a public corporation, belonging to that large class of corporations outside of munici-

palities, which are agencies of the public who receive direct benefit and accommodation from them, as distinguished from private corporations, in which the public is only indirectly interested: Coalesville Gas Co. v. County of Chester, 97 Pa. 476; Pittsburg's Appeal, 123 Pa. 374. In 1857 it located its gas plant on the east bank of the Lackawanna river south of Scranton street, and, from that time on, has furnished illuminating gas to the borough of Providence, a part of the borough of Dunmore, the borough of Hyde Park, the borough of Scranton, and now the city of Scranton, having a population of over eighty thousand inhabitants. It is the only company in the city which makes gas for sale. The population of the city and its suburbs is certainly increasing, and the consumption of gas in the last twelve years has increased seven hundred per cent. The pipes for the distribution of gas to those various places all center at the plant in question, and its location in the central part of the city, and below the general level of the latter, render such location a very desirable one. Several hundred thousand dollars, at least, have been expended in the construction of this plant and the various distributing mains extending throughout the territory which it supplies. On the site selected by it are located a generating house, a house for condenser and scrubbers, a test house, a purifying house and meter, a lime kiln, barn, three gas holders, valve house, etc.

In 1871 it acquired the land now in controversy, not by the power of eminent domain, but in the ordinary way of purchase, in the settlement of the damages for the right of way of a railroad which had been constructed over its lands without authority of law, and which is now owned and operated by the defendant, and which the defendant now desires to widen by the construction of another track. The defendant has instituted proceedings to take the whole of this land (lot 2, block 19), but, as will be pointed out later, is willing to take only a part thereof, while the plaintiff, alleging that the land is a constituent part of its gas plant, and as such devoted to the public uses which its charter authorizes and requires it to subserve, challenges the right of the defendant to take the whole or any part of the lot. The defendant endeavors to meet the challenge by asserting that the right to take the land was expressly given to it by an act of assembly entitled "An act to consolidate the Union

Coal Company and the Howard Coal &. Iron Company," approved February 13, 1867, P. L. 162, and that it has the right to take the land by necessary implication, under an act of assembly entitled " A supplement to an act entitled ' An act to incorporate the Northern Coal & Iron Company,' " approved April 20, 1866, P. L. 1028. It is necessary to consider each of these claims.

The Howard Coal & Iron Company, incorporated by an act of assembly, approved August 18, 1864, P. L. 964, was a private corporation, without the power of eminent domain, although its charter made it " lawful for the said company to construct such lateral or branch railroads, not exceeding twenty miles, as may be necessary to connect any of their lands with the Northwestern, or any other railroad within this commonwealth : " P. L. 1857, p. 784. The Union Coal Company, incorporated by an act of assembly, approved April 26, 1864, P. L. 612, was also a private corporation, and without any railroad privileges prior to the consolidation act of 1867, above mentioned. After the consolidation it was sold out at sheriff's sale under the Act of 1861, P. L. 259, reorganized as the Baltimore Coal & Union Railroad Company, and merged in the Northern Coal & Iron Company, July 6, 1871. The Northern Coal & Iron Company, incorporated by an act of assembly, approved April 27, 1864, P. L. 627, was also, prior to the supplement of 1866, P. L. 1028, above mentioned, a private corporation, though under its charter it had " the right to conduct and operate lateral railroads from their mines, either of coal or iron, not exceeding twenty miles in length, to connect with any railroad now constructed, or to be hereafter constructed in the county of Luzerne : " Act of 1864, P. L. 627, sec. 4. The supplement of 1866 above mentioned is as follows :

" Section 1. Be it enacted, That in addition to the powers conferred by the act to which this is a supplement, the said company may construct or extend their railroad (a single or double track) to any point on the Delaware or Susquehanna rivers, within the counties of Wayne or Susquehanna, and is hereby vested with all and singular the rights, powers and privileges conferred by and made subject to all the conditions contained in an act entitled ' An act regulating Railroad Companies,' approved the nineteenth day of February, Anno Dom-

ini one thousand eight hundred and forty-nine, and shall be
entitled to all the rights, powers and privileges conferred by
all the general laws of this commonwealth relating to rail-
road companies: Provided, said railroad and branches shall
not exceed, in the aggregate, sixty miles in length. And, pro-
vided, said company shall not be authorized to engage in man-
ufacturing of any kind, nor in the vending of merchandise of
any description, nor to extend their road or any branch thereof
below the borough of Scranton, in the county of Luzerne."

It cannot be questioned that the defendant company, under
and by virtue of this supplement of 1866, became and is a pub-
lic corporation, vested with the power of eminent domain, so
far as the construction and operation of the railroad contem-
plated by said acts are concerned. The learned master does not
discuss the question, or express any opinion thereon, whether
under the act of 1866 the defendant has the power to acquire
a right of way where it now seeks it. It was submitted to the
master and pressed upon us at the argument of these exceptions,
and we must answer it as best we can. The practical difficulty
in answering it is that there is neither allegation nor proof as to
where the mines of the defendant company are. The act of
1866, liberal as are its provisions, certainly cannot be construed
into a roving commission to construct a railroad wherever the
defendant pleases. Under the charter, as a private corpora-
tion, it was given " the right to construct and operate lateral
railroads from their mines, to connect with any railroad now
constructed or to be hereafter constructed in the county of
Luzerne." Under the act of 1866 it was given power to
" construct or extend their railroad to any point on the Dela-
ware or Susquehanna rivers within the counties of Wayne or
Susquehanna. . . . Provided, . . . . nor to extend their road,
or any branch thereof, below the borough of Scranton, in the
county of Luzerne," and, as has already been said, vested pro
tanto, with the power of eminent domain and made a public
corporation. But we cannot say from the evidence before us
that these powers now invoked are applicable to the subject-
matter in controversy. As the land is already occupied and
used for public purposes, the burden of showing, not only that
it is needed for its use, but also that it has the right to acquire
it, is upon the defendant. No such state of affairs is shown to

exist under the acts of 1864 and 1866. Although Mr. Weston, the president of the defendant company, testifies that one terminus of its railroad is at Plymouth Junction, in the county of Luzerne, and that the other terminus is at Green Ridge, in the city of Scranton and county of Lackawanna, it is obvious, and shown by all the testimony bearing on that question, that the road now operated by it was constructed, not under the acts of 1864 and 1866, by the defendant, but by the Howard Coal & Iron Company and its successors. But, however that may be, the defendant has not only all the rights and powers directly conferred upon it by the acts of 1864 and 1866, but also all the rights, franchises, powers and privileges of the different corporations mentioned, which have been consolidated and merged into it. And among these franchises and powers conferred upon it are those mentioned in the act consolidating the Union Coal Company and the Howard Coal & Iron Company, approved February 13, 1867, P. L. 162, the third section of which act is as follows :

" Section 3. That it shall be lawful for the said Union Coal Company, upon said merger and conveyance being completed as aforesaid, to construct, erect and complete the railroad now in process of construction by the said The Howard Coal & Iron Company from a point in or near the borough of Wilkesbarre, to a point in or near the city of Scranton, together with all sidings, turnouts, depots, buildings and other improvements necessary thereto, and the same to use and operate by herself, or by any lessee or assign with whom she may contract ; and in such construction and completion of said railroad, and in the procuring and staking the right of way therefor, and in the settlement and assessment of damages for such rights of way as are now occupied, or may be occupied, or taken for said railroad, the said Union Coal Company shall be entitled to all the provisions, rights and privileges, and be subject to all the provisions and conditions of the act of assembly entitled, ' An act regulating railroads,' approved the nineteenth day of February, in the year eighteen hundred and forty-nine, and the supplements thereto."

At the time of the passage and approval of the act of 1867, the Howard Coal & Iron Company had laid out and in progress of construction a railroad from Wilkes-Barre to Scranton. The

route of the road was over the lands of the plaintiff immediately adjoining those now in dispute. The width of the route at the point in question and vicinity was fixed at fifteen feet. The Howard Coal & Iron Company, as has already been said, did not have the power of eminent domain, nevertheless it entered upon and took possession of the plaintiff's land to the width mentioned, and commenced the construction of its railroad. This railroad is the one mentioned and referred to in the act of 1867 as being then "in progress of construction by the said Howard Coal & Iron Company." After the passage of the consolidation act of 1867, and the merger thereunder of the two companies, the Union Coal Company, under its larger powers, completed the construction of said road over the plaintiff's land, with a single track, on a roadbed fifteen feet wide, upon the same location adopted by the Howard Coal & Iron Company, and it has been on the same location ever since. As has already been said, it is now in the control of and being operated by the defendant, which seeks to acquire by the side of it additional track room, and the land over which it seeks to acquire that additional room was a part of the price paid for the right of way over the land which it now occupies.

The defendant contends, and the master has found as a conclusion of law, that under the act of 1867, referred to, the Union Coal Company and its successors acquired legislative authority, not only to occupy the strip of land to the width of fifteen feet which had been entered upon by the Howard Coal & Iron Company, and which is now occupied by the defendant, but also to condemn for railroad purposes upon either side of this strip, to the extent, including the latter, land of the width of sixty feet, and that as successors of said merged companies the defendant has that right.

This is certainly a very liberal construction of the act of 1867, and if the right asserted on behalf of the defendant depended upon this act alone, I would not hesitate to deny it. There is nothing in the act indicative of any intention on the part of the legislature to confer a power to construct a railroad of the width of sixty feet upon a private corporation. On the contrary, the legislature seems to have recognized the fact that this private corporation had a railroad in progress of construction, but was without power to condemn lands. In express words, it author-

ized the Union Coal Company to construct, erect and complete "the railroad now in progress of construction by the said the Howard Coal & Iron Company." This railroad consisted of a single track, and was being constructed on a bed only fifteen feet wide, and the provisions, rights and privileges of the act of 1849 were conferred on the Union Coal Company no further than were necessary "in such construction and completion of said railroad, and in the procuring and taking the right of way therefor, and in the settlement and assessment of damages for such rights of way as are now occupied, or may be occupied, or taken for said railroad." It cannot be denied, however, that the effect of said act of 1867 and the subsequent construction and operation of the railroad thereunder was to make the Union Coal Company and its successors, so far as said railroad is concerned, a railroad company and a public corporation. If that be so, as I believe it is, then this corporation is entitled to the benefits of the Act of March 17, 1869, P. L. 12, which provides, "that it shall be lawful for any railroad, canal and slackwater navigation company, now or hereafter incorporated by or under any law of this commonwealth, to straighten, widen, deepen, enlarge and otherwise improve the whole or any portions of their lines of railroads, canals and slackwater navigation, and the bridges, crossings, sidings, aqueducts, piers and structures thereof, and make new feeders whenever, in the opinion of the board of directors of any such company, the same may be necessary for the better securing the safety of persons and property, and increasing the facilities and capacity for the transportation of traffic thereon, and, for such purposes, to purchase, hold and use, or enter upon, take and appropriate land and material: Provided, that before any such company shall enter upon or take possession of any such lands and material they shall make ample compensation to the owner or owners thereof, or parties interested therein, or tender adequate security therefor." This act was evidently passed for the relief of corporations cramped by the terms of their original charters, and its provisions are broad enough to authorize the Union Coal Company and its successors to widen their railroad and to take the land necessary therefor.

There is, however, another objection to be met, and that is that the land which the defendant seeks to acquire is already

held by the plaintiff as a public corporation, and to some extent devoted to public use. From the time the plaintiff acquired lot No. 2, the land in controversy, it has regarded and still regards it as a part of its gas plant. It erected a building on it which, down to 1878 or 1879, up to which period it manufactured coal gas, was used chiefly, if not entirely, for the storage of bituminous coal used in such manufacture. After the plaintiff abandoned that method in 1878 or 1879 and commenced its present method of gas production by the carbureted water process, this building, up to within a few days of the filing of the bill of complaint, was used only for the storage of pipes, valves and other material pertaining to plaintiff's gas and water plant. A short time before the defendant undertook to take the land, the plaintiff had prepared in a rough manner a pencil sketch of the ground plan of a proposed new building on the lot, in which to erect additional boilers for generating steam for its works, but it does not appear that any definite plans had been adopted. But, however that may be, the plaintiff acquired and has held the land with a view of its future more immediate use in the manufacture of gas, as a place for additional buildings, with machinery and appliances, whenever the increasing demands of the public for gas should overburden its other adjoining lands.

It is settled that property devoted to public uses, including franchises, is subject to eminent domain, and may be taken for other public uses; but it is equally settled that it cannot be so taken without legislative authority expressed in clear terms, or by necessary implication: Groff's Appeal, 128 Pa. 632. As has been pointed out in many cases when a public corporation attempts to take the property of another corporation of the same kind, it is important to consider the necessity of such taking, the nature of the property sought to be taken or the public use to which it was applied, and the extent to which that use would be impaired or diminished by the taking: Boston Water Power Co. v. B. & W. R. R. Co., 23 Pick. 360. The master has cited numerous cases bearing upon this point, and I content myself by referring to his report. I think it can fairly be inferred from these cases that where the interference by one corporation with the property of another can be readily compensated in damages and the whole property made to serve the purposes of both, and the uses of the property by each corporation can stand

together, the right to take will be recognized if the necessity for such taking exists.

There can be no question that the defendant is in urgent need of an additional track, and the master might well have found that the necessity for such additional track is imperative. The plaintiff has suggested the practicability of securing this needed room by three other routes than that proposed by the defendant. The master has found none of these practicable, and I agree with him. . . .

As bearing upon this question of reasonable practicability, to at least some extent, it is proper to bear in mind the extent to which the plaintiff's use of their gas plant will be impaired or diminished by the proposed taking. The master has found that " the relative location of lot No. 2 to the balance of the plaintiff's land is not at all desirable, nor is the former well adapted for use in connection with the latter, for the reason that such use necessitates the constant crossing and recrossing of the defendant's railroad track, and involves a continuous peril to the lives and safety of those thus employed. In this connection the master, after much careful consideration of the evidence in that behalf, further finds that the use and occupancy by the plaintiff of its land between the defendant's track and the river is, irrespective of lot No. 2, entirely adequate to enable the plaintiff to fully exercise its corporate franchises and discharge its full duties to the public ; that such land between the track and the river alone will, with due regard to good engineering in that department, including economy in the expenditure of money, accommodate additional buildings, and that these, including some of the old ones if necessary, may be elevated so as to admit of additional room in a second or higher story for the reception of a part of the appliances required for the manufacture of gas ; that, with this economy in the use of the land in question, not only any present, but also any probable future increase of demand upon the plaintiff for the supply of gas, can be fully and readily met and satisfied ; that any injury which the plaintiff may suffer from the taking by the defendant of lot No. 2 will not seriously interfere with the full exercise by the plaintiff of its corporate franchises or the discharge of its duties to the public, and can be fully compensated in damages."

This finding by the master is made the subject of the first

exception, while his conclusion as to the practicability or rather impracticability of the three other routes suggested is made the subject of the second exception to the report now before us. As has perhaps already been intimated, the disposition of this case depends, not upon one circumstance, but upon a number of circumstances; that chief among these circumstances are the necessities of the parties and the extent to which the property of the plaintiff will be impaired or diminished by the proposed taking. These are, to a large extent, correlative, and cannot well be considered apart. As bearing directly on this question, it is not disputed that the plaintiff acquired lot No. 2 in question for the purposes of its charter, and that it has used and is using it, to some extent at least, under its charter, for public purposes. On the other hand it appears that while the defendant needs additional room for the widening of its railroad, all that it does need is a strip twelve feet wide adjoining their track already constructed. This appears from its own voluntary declaration, placed upon record just before the closing of the testimony. The question before us, therefore, resolves itself into one, whether the defendant can take the strip of land twelve feet in width, for the construction and operation of an additional track, without crippling or destroying the gas plant of the plaintiff, and without impairing and diminishing the use to which it may be put for public purposes to such an extent as to make compensation difficult or impossible. On this question we are in no doubt. While we are not in accord with the finding of the master, which has been excepted to, as to the whole of lot No. 2, the evidence leaves us room for doubt as to the twelve-foot strip. We cannot, and do not wish to belittle the importance and value of the whole of lot No. 2 to the plaintiff. Surrounded as it is by Scranton street on the north, the river on the west, the electric company on the south, and the bluff on the east, even though it is separated from the main body of its plant by the present railroad of the defendant, it is probably as accessible, desirable and valuable to it as any land in that vicinity which it can secure. But it cannot be said from the evidence before us that at the time the defendant undertook to acquire it, and for some time prior thereto, it was an essential part of the plaintiff's plant. Although pencil sketches had been made of a boiler house intended to be erected thereon at the

time the defendant filed its bond, no definite prospective use had been decided upon, and the place was used simply for the storage of pipes, valves, etc., of the plaintiff company, and it was in no sense, except as for possible use in the future, an essential part of its gas plant. And we think that the evidence fairly shows that the suggested future use of the lot for the boiler house, if contemplated, can be fairly served by the land after the appropriation of twelve feet thereof for the defendant's railroad purposes. In other words, although this narrow strip may be valuable and desirable to the plaintiff, it is not essential to its purposes, although the appropriation of it by the defendant may, to some extent, impair the value of the whole plant. Corporations are creatures of the public and were created to serve the public. It is not too much to require them to submit to a slight inconvenience where the public interests are concerned, especially where such inconvenience can be compensated in damages: Pittsburg Junction R. R. Co. v. Allegheny Valley R. R. Co., 146 Pa. 297.

The third exception questions the master's views of the corporate powers of the defendant. While we are not in entire accord with the master's conclusions on this question, we think that the burden of showing the necessity of taking the land now in dispute exists as well under the act of 1867 as under the act of 1869, already referred to, upon the defendant.

The fourth exception is to the final or concluding recommendation of the master, " That if the plaintiff shall elect to accept the proposal of the defendant as to the taking of the lesser amount of lot No. 2, as indicated, and the amendment of the suit on the law side of the court as suggested, then the present injunction shall be made perpetual as to the portion of lot No. 2, which the defendant offers to relinquish, and that as to the balance of said lot not thus offered to be relinquished, the present injunction be dissolved, but in case the plaintiff shall not elect, as aforesaid, before the entry of the final decree in this case, then that the present injunction should be dissolved generally. And we further recommend that the bill be dismissed, whether partially, as above, or generally, depending upon the election of the plaintiff, at the costs of the plaintiff. . . . "

This specification was a definition of what the plaintiff considers necessary for the right of way and was not in the nature

of an offer of compromise. If the defendant had limited its claim accordingly at the beginning of the condemnation proceedings and set up the same in its answer it might be entitled to the decree recommended by the master. On the contrary, it started out to condemn the whole land, asserted the right to take it all, in its answer, and did not admit, until the close of the hearing that all that was necessary for its purpose was the strip twelve feet in width. Under such circumstances we see no good reason why the plaintiff should be condemned to acquiesce in the voluntary declaration of the defendant as to its rights or why it should pay the costs of the proceedings.

As has already been stated we are not in entire accord with the master's findings of facts and conclusions of law which have been excepted to, and have endeavored to express our own views thereon, and subject to the views herein expressed the first, second and third exceptions are overruled and the fourth exception is sustained. We are of opinion that the injunction should be dissolved as to the strip twelve feet in width as specified and described in the defendant's statement or declaration placed upon record before the master; that it should be continued and made perpetual as to the balance of said land, and that the defendant should pay all the costs.

The court dissolved the preliminary injunction as to the strip twelve feet wide of lot No. 2, and made it perpetual as to the balance of the lot.

*Error assigned* was the decree of the court.

*Everett Warren* and *D. T. Watson*, with them *Alfred Hand* and *William J. Hand*, for appellant.—The Northern Coal and Iron Company, the defendant in this case, has not the corporate right to condemn any portion of the land owned by the Scranton Gas & Water Company for the purpose of the building of its second track: Marlor v. P. R. R. Co., 166 Pa. 524; Pittsburg Junction R. Co.'s App., 122 Pa. 511; Sharon Ry. Co.'s App., 122 Pa. 533; Penna. R. Co.'s App., 93 Pa. 150; Groff's App., 128 Pa. 632.

*James H. Torrey* and *George R. Bedford*, for appellee.— Having the power of eminent domain, the defendant company

was authorized to condemn land for single or double track, and mere ownership of land by another corporation, although used for corporate purposes, affords no exemption from condemnation proceedings, unless such land is actually necessary to the corporation claiming such exemption: R. R. Co. v. R. R. Co., 66 Ill. 174; City of Buffalo, 68 N. Y. 175; Northern Cent. R. R. Co., 103 Pa. 628; Com. v. R. R. Co., 27 Pa. 354.

OPINION BY MR. CHIEF JUSTICE STERRETT, May 31, 1899:

In its decree, the learned court below continued the injunction theretofore awarded, as to the greater part of the lot described in the bill, and dissolved the same as to the residue of said lot. This appeal is from so much of the decree as releases said residue from the operation of the injunction.

Among other things, the bill in substance avers that under its right of eminent domain, the plaintiff company took possession of the lot forty feet front on Mechanics street by 150 feet in depth, being lot No. 2 in block 19 on the town plot of the city of Scranton, on which it erected, for the purposes of its business, a building sixty feet front by 120 feet in depth, which it has continuously used for the purposes of its business; that the use of said lot is absolutely necessary to the business in which plaintiff is engaged, viz: furnishing the city of Scranton and the inhabitants thereof with a supply of pure gas; that its plant for the manufacture of gas, erected at an expense of over $200,000, is located on adjoining lots, and is separated therefrom only by the present right of way of the defendant company, and that said property, including the lot above described, is absolutely necessary for the supplying of gas to the public, and has so been used without let or hindrance thirty years and upwards last past; that the defendant company has instituted proceedings on the law side of the court for the purpose of taking possession of said lot No. 2, etc.; and this is followed by a denial of the defendant's right to take said property, and a prayer for an injunction, etc.

On the coming in of the answer, etc., the case was referred to a master who found substantially the following facts: Defendant's railroad extends from the city of Wilkes-Barre, through the city of Scranton, to Green Ridge in Lackawanna county, a distance of over twenty miles, and is a connecting link between

the Wyoming region of the anthracite coal field and the railroad system of the Delaware and Hudson Canal Company in the state of New York. An average of twenty-four passenger and seventy freight and coal trains pass over defendant's road daily, and by reason of its constantly increasing traffic, its whole line has been double tracked, except for a distance of about 500 feet extending through lot No. 2 of plaintiff's gas plant. This line of single track runs for some distance, in a measure parallel with the Lackawanna river, on the low lands lying southeasterly along said river, and at the foot of a steep bluff, rising from the interior curved line of the right of way of the railroad from twenty to thirty feet, and bounding on the northwest a plateau on which a built-up portion of the city of Scranton is located. The line of defendant's railroad, including the single track, may be said to describe a half circle, with a base of about 1,500 feet. Lying between this track and the river is the main plant of plaintiff's gas works.

On the hearing, plaintiff introduced evidence to show the practicability of completing defendant's double track system without appropriating lot No. 2 aforesaid, or any part of it. Three methods were proposed: (*a*) The construction of a tunnel underneath the plateau, and in the neighborhood of the base line of the half circle described by the present track; (*b*) by the construction of an additional track for a distance of 1,600 or 1,700 feet, diverging from the present track in such manner as to avoid lot No. 2, leaving it between the tracks; and (*c*) by the construction of two tracks, substantially on the same line as that last indicated, by abandonment of the present track and right of way through plaintiff's land, and the taking of a sufficient strip from lot No. 2 on the side furthest from the gas works proper, and thus running lot No. 2, so to speak, up against plaintiff's present land, and leaving lot No. 2, as thus moved, untouched.

The master reported that " the tunnel route (*a*) is impracticable by reason of its expensiveness, as well as engineering difficulties." After considering the methods of the other two routes proposed by plaintiff, and the attending difficulties, he concludes thus: " While the defendant might operate its railroad after the completion of either the (*b*) or (*c*) method of accomplishing its double track system, yet the occupancy of lot

No. 2, for that purpose, by placing thereon an additional track immediately adjoining its present single one, as proposed by it at the time of filing this bill, is, from an engineering standpoint, both as regards construction and subsequent use by defendant, the most practicable and feasible method; and, in addition to this consideration, the defendant would be thereby saved in the item of construction alone, an expenditure of $62,000, as already indicated; and the use of Bridge and Scranton streets, as public highways at their present grades, would better subserve the needs of public travel."

The master does not find that a double track at the point in question is imperatively necessary to the defendant company's business, and, while he might possibly have so found from the evidence, it is quite apparent from his conclusions above quoted that there exists no necessity that impels defendant to take plaintiff's land for its additional track. It is simply a question of economy or convenience, or both combined. This is not sufficient to justify the taking of property which has heretofore been acquired under the right of eminent domain and for many years devoted to public use by another corporation. As was said by Mr. Justice GORDON in Pennsylvania Railroad Co.'s Appeal, 93 Pa. 159: "It is true that a franchise is property, and, as such, may be taken by a corporation having the right of eminent domain, but, in favor of such right, there can be no implication unless it arises from a necessity so absolute that, without it, the grant itself will be defeated. It must also be a necessity that arises from the very nature of things, over which the corporation has no control. It may not be a necessity created by the company itself for its own convenience or for the sake of economy. To permit a necessity such as this to be used as an excuse for the interference with, or extinction of previously granted franchises, would be to subject these important legislative grants to destruction on a mere pretense, in fact at the will of the holder of the latest franchise."

After reciting the above quotation, Mr. Justice PAXSON, in Pittsburg Junction Railroad Co.'s Appeal, 122 Pa. 511, employed language especially applicable to the case at bar: "The location claimed for the defendant is a matter of economy, not of necessity. It can construct its road and reach its terminus by another route. It is true, it would be expensive, but it is a

mere question of money and engineering skill. It is not entitled to run through plaintiff's yard and cripple its facilities for handling its business, merely to save money." In Sharon Railway Company's Appeal, 122 Pa. 533, the same learned Justice, reiterating the same principle, says, "It is settled law and rests upon sound principles." The same principle is reaffirmed in Groff's Appeal, 128 Pa. 633, and again in Perry County Railroad Extension Co. v. Newport & Sherman's Valley Railroad Co., 150 Pa. 200.

It may not be amiss to say that there is nothing new or exceptional in the rule that the test of the power to take by implication is "a necessity so absolute that without it the grant itself would be defeated." Implied powers in all cases rest on this basis. Any other rule would be subversive of the law of corporate authority. The rule relating to the appropriation by one corporation of land already dedicated to public use by another corporation, and necessary for the proper exercise of its corporate functions, is too firmly established on both principle and authority to be seriously questioned.

Before this bill was filed, the defendant company had instituted proceedings at law to condemn the whole of said lot No. 2. This was an assertion of the necessity of the whole for its corporate purposes; and the answer filed in this case reiterated that claim. At the close of the hearing before the master, the defendant, in the language of the master, admitted, "that it was sufficient for the construction and operation of the additional track that it should take no more than a strip of said land (lot No. 2) twelve feet wide and parallel with its existing right of way," and "specified as the quantity of plaintiff's land which it was necessary and essential for the purposes of the defendant, a strip east of defendant's present track, whose center line shall be parallel with and twelve feet to the east of the center line of its present track, leaving an open space to the east of the center line of such additional track, equal to the space between the center line of its present track and the land or building of the plaintiff company." While it may be conceded, as before stated, that this amount of land finally claimed may be reasonably necessary to the defendant for its corporate purposes, it is certainly plain that there is no such necessity as would justify it in taking it from the plaintiff.

These considerations are sufficient to dispose of the controlling questions in this case; but a few words on another branch of the case may not be amiss, viz: the necessity of the whole of lot No. 2 for plaintiff's corporate uses. The master found that said lot was devoted by plaintiff to public uses, and " that the use was not merely incidental or casual or as a matter of accommodation in the operation of its plant;" but he further found that it was not an essential part of plaintiff's plant. On exceptions to his report, the learned judge of the court below disagreed with the master's conclusions, except as to the strip twelve feet wide, and he accordingly dissolved the injunction as to that strip and made it perpetual as to the residue of lot No. 2. The findings of facts and his reasoning thereon should have led him to the logical conclusion that the injunction should be made perpetual as to the whole of the said lot No. 2. It appears to us that the learned court below attached too much importance to the immediately present needs of the parties, and not enough to their future needs. Our consideration of the evidence has led us to the conclusion that it presents a much stronger case in plaintiff's favor than appears in the opinions of the master and the court below. Defendant's expert witness, Byrne, in his examination in chief, speaking of the value of lot No. 2, said: " Restricted as they are for ground there, it might be of more than ordinary value to the gas company." He also admitted that on account of the conformation of the ground of lot No. 2, the expense of a retaining wall would be enough to prevent the use of the lot for building purposes after the strip twelve feet wide was taken off. The witnesses substantially agree that the cost to the plaintiff in rearranging the gas plant in accordance with the defendant company's suggestion, would equal, if not exceed, the additional cost to the defendant of adopting one of the alternative routes that would not injure the plaintiff company. There are also grave doubts whether the plans suggested on behalf of the defendant are either feasible or safe. But it is not our purpose to discuss the evidence. Enough has been said to show that the learned court below erred in not making the injunction perpetual as to the whole of said lot No. 2.

The decree of the court below is accordingly reversed and set aside; and it is now adjudged and decreed that the defend-

ant company, its agents, workmen, servants and employees be, and they are hereby, severally enjoined forever from entering upon or taking possession of plaintiff's lot No. 2, described in the bill, or any part thereof, and also from laying railroad tracks thereon, or in any manner obstructing the plaintiff company in the free use and enjoyment thereof; and it is further ordered that the defendant company pay all the costs, including the costs of appeal.