MEMPHIS STATE LINE RAILROAD COMPANY *v.* FOREST HILL CEMETERY CO.

(*Jackson.* April Term, 1906).

1. **CEMETERY COMPANY. Lands of, dedicated to public use.**
The lands acquired for cemetery purposes, pursuant to the terms of its charter, by a cemetery company incorporated under the general laws of this State, are thereby dedicated to a public use.

2. **SAME. Same. Not defeated by fact that incorporators may make profit; nor because charter does not fix price of lots.**
The public purpose to which such lands are dedicated is not defeated, and the use rendered a private one, by the fact that the incorporators may realize a profit out of the enterprise, nor because the charter does not fix the prices at which burial lots are to be sold.

Case cited and approved: Ryan v. Terminal Co., 102 Tenn., 111.

3. **SAME. Same. Not defeated by charter power to mortgage. Nothing can be mortgaged except net proceeds of lots.**
The power to mortgage contained in the charter of a cemetery company incorporated under the general laws of this State does not negative an intention that its property shall be devoted to a public use; for the nature of the rights secured by the charter to lot owners is such as to forbid the mortgaging of anything except that part of the proceeds of lots sold which is not devoted to the maintenance and improvement of the cemetery—the charter containing a provision that twenty-five per cent of the proceeds of the lots sold shall be devoted to such purposes.

Cases cited and approved: Oakland Cemetery Co. v. People's Cemetery Co., 93 Tex., 569; Waldron's Petition, 26 R. I., 84; Thompson v. Hickey, 59 How. Prac. (N. Y.), 434; Schroeder v. Wanzor, 36 Hun (N. Y.), 423.

Railroad Co. v. Cemetery Co.

**4. SAME.** Same. **Must sell to all who apply, without discrimination.**

Such cemetery company, being organized for a general public purpose, must sell to all who may apply "the same measure of accommodation for the same measure of money." The power conferred by the charter upon its board of directors to sell the lots "in such manner" as they may determine, has reference to the modes and terms of payment, the taking of securities therefor, and the like, and not to the persons to whom they shall sell.

Case cited and approved: Evergreen Cemetery Assn. v. Beecher, 53 Conn., 551.

**5. EMINENT DOMAIN.** **Property devoted to public use cannot be taken for another public use without legislative authority, and then necessity must be absolute.**

Property devoted to one public use cannot be lawfully taken for another and inconsistent use without express or plainly implied legislative authority; nor can one public corporation condemn and appropriate land already devoted to the public use, for the sake of economy, or by virtue of any necessity created for its convenience. Nothing less than absolute necessity which arises from the very nature of things will warrant such a proceeding.

For cases cited see opinion (*post, pp.* 412-414).

**6. SAME.** Same. **Rule not changed by ch. 135, Acts 1885.**

Chapter 135, Acts 1885, providing that our general statutes conferring the right of eminent domain shall be so extended as to "apply to and include the condemnation and taking of the property, privileges, rights, or easements of private corporations for public purposes or internal improvements" does not remove the limitations upon the exercise of the power of eminent domain stated in headnote 5.

Act cited and construed: 1885, ch. 135.

Case cited and distinguished: Railroad v. Telegraph Co., 101 Tenn., 62.

116 Tenn.—26

Railroad Co. v. Cemetery Co.

**7. SAME.** Same. Cemeteries not subject to be taken for another public use.

In view of our statutory provisions designed for the protection of the burial places of the dead, it will not be presumed that the general language employed in the statutes governing the exercise of the power of eminent domain was intended to authorize the taking of such property for another and inconsistent public use.

Acts cited:   1873, ch. 94; 1857-8, ch. 63.

Code cited:   Secs. 3053-3058, 6512, 6524, 6772 (S.); secs. 2304-2309, 5413, 5425, 5659 (M. & V.); secs. 4664, 4849 (1858).

Case cited and distinguished:   Re Application Board of Street Opening and Improvement, 133 N. Y., 329.

**8. SAME.** Same. Same. Case in judgment.

A railroad company cannot condemn a right of way through a tract of 180 acres of land acquired for use as a cemetery by a company incorporated for that purpose, where the plans devised by the company contemplate the use of the whole as a cemetery, although only about thirty-six acres have thus far been occupied by the burial of bodies, and the proposed right of way would occupy 4.49 acres, passing through a corner of the tract not yet used for burial purposes, and severing 23.35 acres from the main body; it appearing that there are two other routes available to the railroad company, each of which, however, would be more expensive than the route through the cemetery.

Cases cited and distinguished:   Colorado Eastern Ry. Co. v. Union Pac. Ry. Co., 41 Fed., 293; Chi. & N. W. R. Co. v Chicago R. R. Co., 25 Am. & Eng. R. R. Cas., 154.

---

FROM SHELBY.

---

Certiorari to the Circuit Court of Shelby County.— J. P. YOUNG, Judge.

MR. JUSTICE NEIL made a statement of the case as fol-
lows.

The purpose of the present proceeding was to condemn
a right of way for the plaintiff railway company through
Forest Hill Cemetery. Forest Hill Cemetery is located
something over two miles from the city of Memphis. It
comprises 180 acres. The railroad proposes to run
through the southeast corner, appropriating four and
forty-nine one hundredths acres, and severing from the
body of the cemetery twenty-three and thirty-five one
hundredths acres lying east of its line. There are no
bodies interred along the proposed line of railway; this
portion of the cemetery being at present covered with
wild growths. Before the present proceedings were be-
gun, however, a plan had been devised and had been
partly executed for adorning all the grounds belonging
to the cemetery company so as to make them harmon-
ious and beautiful in all their parts. The ground in
question is the most desirable of all the 180 acres from
a scenic point of view. The cemetery has been in use as
a place for interment about eight years, and during this
period 1,300 bodies have been buried therein, in a space
covering about thirty-six acres.

There are two other routes along which the railroad
might be located without touching the cemetery. One
of these routes lies north of the cemetery and runs
parallel with the line of the Union Railway Company.
This would be a more expensive route than the one in
question, however, because of the topography of the

country, and also from the fact that there are residences
along the line. It is also suggested that this line would
lead through the Jewish Cemetery in the same neighbor-
hood through a tract in which bodies have been interred;
but the evidence shows that the line may be run along
this route, so as not to interfere with the last-mentioned
cemetery. The evidence shows that there is another line
along which the road might be located, lying south and
east of Forest Hill Cemetery. The construction and
maintenance of this line, however, would be much more
expensive than the one through Forest Hill Cemetery,
owing to the fact that there would have to be a very deep
cut made through a hill.

The evidence also shows that the present line may be
pursued without interfering with Forest Hill Cemetery,
by making a curve around it, but the construction and
operation of such a line would be more difficult than the
one now laid out.

Forest Hill Cemetery was chartered in 1892. The
charter, among other things, contains the following pro-
visions: "The said corporation shall have the power to
purchase land, not exceeding two hundred acres, situ-
ated not less than one mile from the corporation line of
a town containing fifteen thousand inhabitants, nor less
than two miles from the corporation line of a town con-
taining a greater number of inhabitants, to be used as a
cemetery or burying ground forever; to lay the same off
into suitable avenues or walks and embellished with
trees, shrubbery or flowers, subdivide the grounds into

lots, suitable for graves, monuments and vaults, and sell the same in such manner as the board of directors may determine, and all lots thus sold to purchasers shall forever be free from attachment or the levy of an execution. . . . Said corporation may hold any grant or bequest in money or other property and shall faithfully apply the same for the improvement of said cemetery, or in the erection or preservation of any tomb or monument, according to the terms of said grant or bequest. It shall be the duty of the corporation to set apart twenty-five per cent of all lots sold, to be denominated an improvment fund, and the same to accumulate until the interest amounts to a sufficient sum to keep in order the entire grounds used as a cemetery, and any person, or the descendants of any person, who has bought a lot shall have the right to look after and see to the preservation of the said fund and the proper application of the interest. Until the interest on the fund accumulated, as aforesaid, is sufficient for the purpose aforesaid, the corporation is bound to keep the grounds in order out of the remaining three-fourths of the proceeds of the lots."

In the actual practice of the corporation under its charter, it holds itself out as being willing to sell, and it does sell, lots to any one who will apply therefor, and pay the price demanded, except to members of the negro race. It does not appear, however, that any person of the latter race has ever sought or offered to buy a lot or lots in this cemetery. In the court below the railway was granted the right of condemnation through this

cemetery, and damages were assessed. Thereupon the defendant cemetery company brought the case to this court on petition for certiorari and supersedeas. The case has been argued before us in open court, full briefs have been filed, and it now stands for decision.

C. N. BURCH and A. W. BIGGS, for Railroad Company.

HENRY CRAFT and T. B. TURLEY, for Cemetery Company.

MR. JUSTICE NEIL after making the foregoing statement of facts, delivered the opinion of the court.

A question of prime importance in this case is whether the land of the defendant company was by the terms of its charter devoted to a public purpose. To settle this point we must construe the charter. It is clear that when the incorporators of the defendant company organized under the charter, and the company bought land pursuant to the powers vested, that land at once became dedicated to cemetery purposes, for the interment of the bodies of the dead, and for the beautification of the grounds as a ministration to the sensibilities of the living. A purchase under such circumstances could mean nothing less.

But for what people was it intended the duties imposed by the charter should be performed? We receive the answer to this inquiry when we note that the land to be purchased and used must lie within a specified dis-

tance from large centers of population. This signifies
that it was intended primarily for the use of the people
of such cities. Would that purpose be served by confining
the privileges intended to be conferred to the use and
enjoyment of a few individuals, or to the members of one
or more classes of the population to the exclusion of
others? Manifestly not. Such a construction would de-
feat the intention of providing a convenience, nay, a
necessity, for the benefit of the cities of the State. The
cities themselves might have been invested with the power
to conduct the business, as they may be given power to
own and conduct their street car lines and telephone
lines; but the legislature, deeming that the duties im-
posed could be better discharged under the management
of private persons, gave to such persons, in the present
instance, these powers to be exercised for the conveni-
ence of the cities, and the public.

It is not a valid objection to this view that the incor-
porators may realize a profit out of the enterprise. *Ryan
v. Terminal Co.,* 102 Tenn., 111, 50 S. W., 744, 45 L. R.
A., 303. Nor is it a valid objection that the prices of
the lots are not fixed. *Id.*

It is insisted that the power given to mortgage con-
tained in the charter indicates that the cemetery was
not intended for public use. We do not think anything
could be mortgaged, but the proceeds of the lots not de-
voted by the charter to the purpose of maintenance. The
nature of the rights secured by the charter to lot owners
is such as to forbid the mortgaging of anything else.

Compare *Oakland Cemetery Co.* v. *People's Cemetery Ass'n* (Tex. Sup.), 57 S. W., 27, 55 L. R. A., 503; *Waldron's Petition,* 67 L. R. A., 118, and note 8, p. 122, citing *Lautz* v. *Buckingham,* 4 Lans. (N. Y.), 484; s. c., 11 Abb. Prac. (N. S.), 64; *Thompson* v. *Hickey,* 59 How. Prac. (N. Y.), 434; *Schroeder* v. *Wanzor,* 36 Hun (N. Y.), 423. Moreover, the right to mortgage, when the nature of the property is such that it can be so disposed of, does not negative a public use. Railroads are frequently mortgaged and subjected to foreclosure, yet no one denies that they are affected with a public use notwithstanding.

The duty is imposed upon the cemetery company to subdivide the ground into lots suitable for burial purposes, and to sell these lots. The board of directors is given power to sell the lots "in such manner" as they may determine. This has reference to modes and terms of payment, and the taking of securities therefor, and the like, not to the persons to whom they shall sell. This latter phase of their duties is controlled by the general public purpose for which the corporation was permitted to be organized. That purpose can be satisfied only by selling to all who may apply the same measure of accommodation for the same measure of money. *Evergreen Cemetery Ass'n* v. *Henry Beecher,* 53 Conn., 551, 5 Atl., 353, and see Lewis on Eminent Domain, vol. 1 section 176; 10 Am. and Eng. Enc. of Law (2d Ed.), p. 1085. And the operation of the principle is not altered by the fact that some persons may be unable to avail themselves of the privilege offered by reason of their inability to

pay therefor. "As a rule men are not allowed to ride in cars, or pass along turnpikes, or cross toll bridges, or have grain ground at the mill, without making compensation. One man asks and pays for a single seat in the car, another for a special train, all have rights, each pays in proportion to his use, and some are excluded because of their inability to pay for any use. Nevertheless, it remains a public use as long as all persons have the same measure of right for the same measure of money." *Evergreen Cemetery Ass'n* v. *Beecher,* supra.

Whether, in the subdivision of the ground by the board of directors into lots, some, the average of quality in respect of the whole being maintained, may be grouped together, and segregated from the others, and held for sale to a particular class of the population of the city in analogy to the separation enforced by law in public conveyances, we need not consider, as that question does not arise in this case. The property having thus been devoted to one public purpose, can it be taken for another? For the moment we shall treat this question on the assumption that cemetery property stands on the same ground that other properties do which have been dedicated to a public use. We shall presently see that under our statutes there is a difference.

"The right to take property already devoted to public use must be given in express terms or by necessary implication. . . . Whether the power exists in any given case is a question of legislative intent, to be ascertained in the first place from the terms of the statute, and in

the second place by the application of the statute to the subject-matter. If the language of the statute is explicit, as where a particular turnpike is authorized to be taken and laid out as an ordinary highway, the courts have nothing to do but to give effect to the express language of the statute. But, if the language of the statute is not explicit, then it is a question of reasonable intendment, in view of all the circumstances of the case. . . . The chief difficulty arises when authority to condemn property for any purpose is given in general terms, as is usually the case in these latter years. In such case the presumption is against the right to take property which is already devoted to public use." 1 Lewis, Em. Domain, p. 664.

"Land owned by a company whose business constitutes a public use, not in actual use nor essential to the exercises of its franchise, stands on the same footing as that of a private individual, and may be condemned by another corporation under the general laws, although the land is taken from the actual and profitable use of the owner. Nevertheless there must be a liberal consideration of the future, as well as the existing needs of the company whose land is sought to be appropriated, before it can be deprived of any portion thereof; but the mere possibility that the land sought to be taken may at some future time become necessary to the exercise of the franchise of the company owning it does not exempt it from condemnation, and neither does the fact that the prop-

erty is put to a use not necessary to the exercise of the franchise.

"Where property has been legally condemned or acquired by purchase for a public use, and has been or is about to be appropriated for such use, it cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication. While, within the limitations hereinbefore mentioned, express statutory authorization is sufficient to authorize the taking of property devoted to public use, although it impair or destroy the prior use, express authorization is unnecessary; it being sufficient if the right is conferred by necessary implication. When it becomes important to inquire whether such power arises from necessary implication in a given case, the legislative intent has to be arrived at by applying the enactment to its subject-matter. Such implication never arises except as a necessary condition to the beneficial enjoyment and efficient exercise of the power expressly granted. It is not enough that the property sought to be taken will be a convenience to the company seeking to appropriate it. The implication does not arise if the powers expressly conferred can by reasonable intendment be exercised without the appropriation of property actually used for another public use, and in no event can it be extended further than the necessities of the case require. As regards the degree of necessity, some decisions hold that

no implication arises except from a necessity so absolute that without taking property previously devoted to a public use the grant itself would be defeated, and that the necessity must also arise from the very nature of things over which the corporation has no control. Other decisions, however, hold that the necessity from which the implication may arise is not an absolute and unconditional necessity as determined by physical causes, but a reasonable necessity to be determined from considerations of practicability, economy, and facilities under the peculiar circumstances of the cases, having due regard to senior rights and benefits to the public.

"In the absence of some statutory provision expressly or by implication forbidding it, property devoted to one public use may under general statutory authority be taken for another public use, where the taking will not materially impair or interfere with, or is not inconsistent with, the use already existing, and is not detrimental to the public. It is not material that some inconvenience may result to the prior occupant, if the conditions are such that the two uses can stand together. The rule that power must be conferred expressly or by necessary implication applies only where the second use will destroy or injure the use to which the land was originally appropriated."

15 Cyc. 614-617. And see *Cleveland, C., C. & St. L. R. Co.* v. *Ohio Postal Tel. Cable Co.*, 68 Ohio St., 306, 67 N. E., 890, 62 L. R. A., 941, and notes; *Denver Power &*

Railroad Co. v. Cemetery Co.

*Irrigation Co.* v. *Colorado & S. R. Co.*, (Colo.), 60 L. R. A., 383, and note.

In accord with these principles, it has been held that a railroad, under its general power to construct a road between certain termini, cannot condemn a right of way through land acquired by a city for a reservoir (*State* v. *Montclair R. R.*, 35 N. J. Law, 328) ; or the land of a gas company which is indispensable to its works, unless there is a necessity so absolute that the enterprise without it would be defeated (*Scranton Gas Co.* v. *Iron Co.*, 192 Pa., 80, 43 Atl., 470, 73 Am. St. Rep., 798) ; or a public park (*In re Boston & A. R. Co.*, 53 N. Y., 574) ; or the grounds of a State lunatic asylum (*In re city of Utica* [Sup.], 26 N. Y. Supp., 564) ; or land in use for a State institution for the blind (*Railroad Co.* v. *Trustees*, 43 Ill., 303) ; or the land of another railroad company, for the reason that it would avoid a sharp curve in its road which it proposes to build (*Barre R. Co.* v.- *Montpelier & White River Co.* [Vt.], 17 Atl., 923, 4 L. R. A., 785, 15 Am. St. Rep., 877).

"The grant of a right," said the supreme court of Massachusetts, "is, by reasonable construction, a grant of power to do all the acts reasonably necessary to its enjoyment; but if to the minds of reasonable men, conversant with the subject-matter, another line could have been adopted between the termini without taking the highway, reasonably sufficient to accommodate all of the interests concerned, and to accomplish the objects for which the grant was made, then there was no such neces-

sity as to warrant the presumption that the legislature intended to authorize the taking of the highway." *Springfield* v. *Railroad,* 4 Cush. (Mass.), 72.

"It is a basic rule of the exercise of the power of eminent domain," said the court, in *St. Louis & S. F. Ry. Co.* v. *Southwest Tel. Co.,* "that property devoted to one public use canot be taken lawfully for another and inconsistent use without express or plainly implied legislative authority. *Chicago & A. R. R.* v. *City of Pontiac,* 169 Ill., 155, 48 N. E., 485. Nor can one corporation condemn and take away the right to the use of property already devoted to the public use, for the benefit of another corporation for the mere sake of economy, or by virtue of any necessity created for its convenience. Nothing less than absolute necessity which arises from the very nature of things, will warrant such a proceeding." 58 C. C. A., 207, 121 Fed., 285; *St. Louis R. R.* v. *Trustees,* supra; *I. C. R. R. Co.* v. *B. B. & N. R. Co.,* 122 Ill., 482, 13 N. E., 140; *Housatonic Ry.* v. *Lee & H. Ry.,* 118 Mass., 391.

It is insisted that in this State a special power is conferred by chapter 135, p. 245, Acts 1885, to subject the land of private corporations to the right of eminent domain. That statute, so far as necessary to quote, provides that our general statutes conferring the right of eminent domain shall be so extended as to "apply to and include the condemnation and taking of the property, privileges, rights, or easements, of private corporations for public purposes or internal improvements." If this

statute applies only to private corporations organized for the prosecution of private business, it added nothing to the general statutes upon the subject, since, without doubt, such property could, prior thereto, be condemned for public use under those statutes. If it was intended to apply to the property of quasi public corporations, the same result follows, because these, under a proper construction, were already subject to the power, under the limitations above stated. It is true this court, in *Railroad* v. *Telegraph Co.,* 101 Tenn., 62, 46 S. W., 571, 41 L. R. A., 403, referred to this statute as a convenient statement of the principle. It was not deemed necessary in that case to consider the limitations of the rule. Certain it is the court did not intend to hold that, under the statute quoted, property already devoted to one public use could be condemned for another to the injury of the corporation so subjected, when there was no necessity for such condemnation in order to effect the purposes of the corporation seeking the condemnation. On the contrary, it was expressly stated in the opinion that the use of the property of the railway company would be in no way impaired by the erection of telegraph poles along the right of way. We apprehend the statute in question was passed to clear up the ambiguity arising from the use of the word "individuals" in the general condemnation statutes, in the clause (Shannon's Code, section 1844), "may take the real estate of individuals." But be this as it may, whether the act of 1885 was intended as declaratory of the existing law or as creating

a new rule, it is still couched in general terms and would be subject to the reasonable limitations set forth in the authorities which we have quoted.

.We shall now apply the rule to the facts contained in the statement. It appears from these facts that there are two independent routes which the plaintiff may pursue without interfering with the grounds of defendant cemetery company; also that the original route laid out may be pursued in the main by making a detour around the cemetery grounds. That it may be more expensive or inconvenient to construct and operate the plaintiff's line along these routes than along a line running through the cemetery is not, as we have seen, a sufficient answer under the authorities.

It is insisted that the northern route mentioned in the statement is impracticable, because there is not room on the street known as Broadway in the city of Memphis for another track.   Leaving out of view the fact that the cemetery lies two miles or more south of the city, and that Broadway is far to the north of this property, it does not appear from the evidence that it will be necessary, in order to pursue the northern line, that a track should be laid on Broadway.   The testimony of Mr. Proctor, plaintiff's engineer, when taken altogether, is quite equivocal upon this subject.   The only clear reasons he gives against the use of the northern route is that it would be more expensive on account of the topography of the country, and that it would parallel the Union Railway line nearly all the way.   The testimony

of Mr. Proctor upon this special phase of the matter is interesting:

"Q. Now, you have stated, as to the first-mentioned route which contemplated going south of the cemetery, that it was a question of extra expense. Why is the other route, that north of the cemetery, objectionable? A. For two reasons; the first the expense of construction and operation, and also because it would put this line right at the Union Railway all the way. Q. Why would that have been a little more costly than that approved? A. Because the topography of the ground was such. Q. And why is the proximity of the Union Belt Railroad track an objection? A. I guess because this company does not want to crowd their friends."

It is insisted that the northern route is objectionable because it would necessitate the construction of the road through the Jewish Cemetery over land where dead bodies are buried. This is sufficiently disposed of in the statement, by a finding to the effect that the evidence shows that no such necessity exists. We refer to it here, however, for the purpose of the following observations: We should be far from holding, in the absence of a special and unmistakable act of the legislature upon the subject, that a railroad, or any other kind of a road, could be run through the graves of the dead, interred even in a private graveyard. We have no statute providing for the removal of bodies, and there is nothing on our general stat-

ute regulating the right of eminent domain that contemplates such a contingency. We have been referred to *Re Application of the Board of Street Opening & Improvement*, 133 N. Y., 329, 31 N. E., 102, 16 L. R. A., 180, 28 Am. St. Rep., 640, a successful proceeding brought to acquire land for a public park on the grounds of St. Johns Cemetery, property belonging to a private corporation commonly known as "Trinity Church." In respect of this case, it is to be observed that the opinion mentions the fact that no burials had been made in that cemetery for fifty years, also that there was a statute in New York providing for the careful disinterment, removal, and reinterment of the remains of deceased persons, at the expense of the persons making a public improvement, when land was sought to be applied for such a purpose. We have no such statute in this State. On the contrary, we have a statute which makes it a crime to disinter and remove "the dead body of any human being, without lawful authority from the place of its interment," or to assist in so doing. Shannon's Code, section 6772. These repositories of the dead are regarded with veneration in this State. Special provisions are made for policing them. Shannon's Code, sections 3053-3058. By a special statute upon the subject (Acts 1873, p. 129, c. 94), they are guarded against unseemly noises, in them or within one-hundred yards of them; they are also guarded against rude and indecent behavior on the part of any and all persons; and it is made a crime to "willfully destroy, mutilate, deface, injure or

remove any tomb, monument, or gravestone, or other structure placed in any cemetery in the State, or any fence, railing, or other work for the protection or ornament of any cemetery, or any cemetery lot within a cemetery, or to willfully destroy, cut, break, or injure any tree, shrub, or plant within the limits of any cemetery in this State." Shannon's Code, sections 6512, 6524; Acts 1857-58, p. 75, c. 63.

In the face of these provisions, can it be supposed that the legislature, when they used the general language employed in our statute of eminent domain, intended that that statute should apply to such places? We think not. True it is the dead must give place to the living. In process of time their sepulchers are made the seats of cities, and are traversed by streets, and daily trodden by the feet of man. This is inevitable in the course of ages. But while these places are yet within the memory and under the active care of the living, while they are stll devoted to pious uses, they are sacred, and we cannot suppose that the legislature intended that they should be violated, in the absence of special provisions upon the subject, authorizing such invasion, and indicating a method for the disinterment, removal, and reinterment of the bodies buried, and directing how the expense thereof shall be borne.

It is insisted that Forest Hill Cemetery company will not be injured by the construction and operation of a railway through its premises, because no bodies are interred along the proposed route, and that portion of the

cemetery has not as yet been improved. These object-
ions are well answered in the main by the case of *Ever-
green Cemetery* v. *New Haven.* The city, acting under
a general power conferred upon it to lay out, construct,
and maintain all necessary highways within its limits,
sought to run a public street through Evergreen Ceme-
tery over land occupied at the time by a border of ever-
greens and in part by Evergreen avenue laid out in the
cemetery. Speaking to these facts the supreme court of
Connecticut said:

"That the legislature has the right to authorize the
taking of land already applied to one public use, and de-
vote it to another, is unquestionable. . . . The language
here used is broad enough to embrace all land, whether
used for one purpose or another. Nevertheless, there are
cases in which it will be presumed that the legislature
presumed it should not apply. It will be assumed that
land devoted to one public use will not be taken and de-
voted to another inconsistent with the first. The same
land cannot properly be used for burial lots and for a
public highway at the same time. The two uses are in-
consistent with each other, and the one practically ex-
cludes the other. . . . It makes no difference that the
part taken was used for shrubbery and a carriageway.
A cemetery includes not only lots for depositing the
bodies of the dead, but also avenues, walks, and grounds
for shrubbery and ornamental purposes. All must be
regarded alike as consecrated to a public and sacred use.
The idea of running a public street, regardless of graves,

Railroad Co. v. Cemetery Co.

monuments, and the feelings of the living through one of our public cemeteries, would be shocking to the moral sense of the community, and would not be tolerated except upon the direct necessity. Yet the right to do so must be conceded, if the action of the city in the present case can be vindicated. The right to take one part of a cemetery implies a right to take to another, and the right to take one part implies the right to take the whole." 43 Conn., 240, 21 Am. Rep., 643.

In the present case, it appears that the whole tract was devoted to the public use, when the defendant corporation organized, and purchased the land under its charter. The plan is an entirety. The destruction of any part would mar the whole. It is true that the whole area has not yet been beautified, but plans have been devised for this purpose. It is also true that only a small part of the cemetery has been put into actual use for the burial of bodies; but no one can doubt that, situated as it is, so near a large city, all of its domain will be eventually needed for the purposes of interment. Such a forecast is not to be compared to the cases cited in plaintiff's brief: *Colorado Eastern Ry. Co.* v. *Union Pac. Ry. Co.* (C. C.), 41 Fed., 293; *Chi. & N. W. R. Co.* v. *Chicago R. R. Co.,* 25 Am. & Eng. R. R. Cases, 154— wherein it was held that one railroad company could not hold an undue quantity of land for future possible use; against the present and urgent need of another railway company, but must suffer such surplus land to be condemned and taken. The future needs of business are

problematical. The demands of death are certain.

For the reasons stated, we are of opinion that the certiorari applied for should be granted, and the supersedeas awarded. So ordered.

JUSTICES WILKES and SHIELDS delivered the following concurring opinion.

We concur with the conclusion reached in the opinion, but prefer that the decision be placed upon broader grounds. In our view, real estate in Tennessee conveyed for cemetery purposes forever, whether to a public or private corporation, or to a board of trustees to have perpetual succession, is *ipso facto* as a matter of law dedicated to a public use of a sacred character, and forever withdrawn from all the incidents to which other real estate may be liable, so far as inconsistent with its use for burial purposes, including the liability to be taken, or condemned, under the power of eminent domain or for secular purposes. Whatever may be the statute of any other property, public or private, the right to condemn cemetery property for railroad, commercial, or secular purposes does not exist under any general law giving a right of condemnation, so long as the use or dedication of the property continue, as is said in the opinion. We do not believe that any legislature of the State of Tennessee will ever undertake to authorize such invasion and the condemnation of such property, and we do not desire to appear to hold that such an act

Railroad Co. v. Cemetery Co.

would be sustained, if passes.   We do not think that the fact that the use of such property may be necessary, either absolutely or conditionally, can have any controlling influence in giving such right.   No emergency or contingency or necessity can justify the condemnation and invasion of the resting places of the dead. We do not think that such property can be taken, even though provision should be made for opening the graves and removing the bodies of the dead, no matter how decently done, so long as the dedication continues.   In short, we are of opinion that the law and spirit of our government and civilization, as well as the dictates of sound public sentiment, demand that cemeteries shall never be invaded for railroad, or other secular, purposes, so long as they remain dedicated to the repose of the dead.

The wheels of commerce must stop at the grave.